Good morning, and may it please the Court. Steve Odendall for the Conservation Organizations. I'd like to reserve three minutes for rebuttal, and I'd like to start with the issue raised by the Court regarding finality. So, the conservation organizations here are challenging EPA's approval of an ozone plan. That approval is the consummation of EPA's decision-making process regarding the plan, and it determines the obligations of the District and EPA under the Clean Air Act, and the rights of the public under the Clean Air Act. So, it is a final action. So, under the APA, the conservation groups have the right to judicial review for it. That's APA, that's 5 U.S.C. 702. Now, in order to effectuate that right, the Court has to look at the record for that final action, and that record includes the preambular statements made by EPA here. EPA offers these two alternative interpretations of the Act, and then goes on to say, under either of these readings, available emissions information from California indicates the plan is adequate to maintain the max, but for emissions from and applying it to the plan before the agency here. And the result of that, because EPA has two alternate grounds here, is, as EPA points out, is that we have to prevail on both in order to succeed in this case. Now, this is different than, say, for chemical, because there, there was no particular chemical before the agency. The EPA was discussing how it was going to act on chemicals in the future, doing risk review. So, this is, in fact, actually the opposite of the safer chemical. Now, even that you agree that the second interpretation would be okay, why couldn't we just proceed on that assumption? I mean, it doesn't seem that the agency has committed itself to any particular interpretation here. So, Your Honor, we both say that the second, the way EPA implemented that second interpretation, with its 10-year look ahead, and was both promulgated without adequate notice, and by itself was not enough to carry out the Act's requirements for maintenance, because it did not impose any ongoing obligation. It was just a one-time look ahead. EPA— in their own right, without deciding what the interpretation of the statute is. Yes, Your Honor, you're not required to decide here. You're just required to decide that, you know, in order for us to prevail, you have to decide that the first interpretation is invalid, because that's our primary claim against it. The second, you don't have to determine what a permissible interpretation is, because there's all sorts of possible interpretations, or ways to implement the second interpretation. So, if the Court has no further questions on the finality issue— Counsel, I have a question. Yes, Your Honor. On this. How long does the maintenance obligation extend? Well, Your Honor, the EPA does not answer that question in its final action. The District raises this fear that the maintenance obligation could go on forever, and its concern is that it would be impractical for it to demonstrate that its plan is going to be adequate forever to maintain the standards. But that really depends on how EPA decides to implement this ongoing obligation. So, one way EPA could do it, for example—and there are many—would be to have the District give a report at some reasonable periodic interval, say five or ten years, as to whether emissions from Mexico and emissions from the county have changed. And if so, does it mean that the District has to do anything more in their plan? So, if the District put a commitment to do that into their plan, then their plan would be adequate to maintain the standards, but for international emissions, on an ongoing basis. Now, one eventual endpoint for this could be if the area actually does attain the standards, regardless of international emissions, then the area can apply for redesignation. Okay, thank you. Yes. So— I actually have a follow-up question on this finality reviewability issue. So, just trying to figure out—I mean, I take your point that the actual decision approving the plan can definitely be reviewed, but if the agency hasn't committed to a particular statutory interpretation, then, for example, your argument that the final rule was not a logical outgrowth of the proposed rule, I don't know if we really can review that, because I think that argument has to do with the agency adopting a statutory interpretation, but if we don't really think they did adopt a statutory interpretation, I don't understand what we're supposed to do with that logical outgrowth argument. Well, first, Joanna, we have two parts to our logical outgrowth argument. There's the failure to give notice of these dueling interpretations, but there's also the failure to give notice of the information they relied on to approve the plan. Right. I guess I viewed the information relied on as sort of a different point about whether the data was disclosed or not, and not really—well, I guess you could call it part of the logical outgrowth, but I thought that was more a different point about whether the data had been disclosed. So, Your Honor, if—let's say there are three possible interpretations of statute, and the agency says, here are two it could be, and we're not deciding between them, and either way the plan can be approved, then we, in order to prevail, would have to show that both of those were impermissible, because they're alternate grounds. Now, essentially that's what's happening here, because we're saying the way they implemented the second interpretation is impermissible. So, sorry, maybe there are other questions. I don't know if my colleagues have other questions on the finality. I don't. All right. Now, if I may turn, I'd like to go next to the notice issue here. So, in the final rule, EPA relied on emissions data up to the year 2030, and that emissions data came from a state plan for a different pollutant, of course, particulate matter, and from a state database, and they were not part of the plan that was submitted and that EPA was acting on here. They were not in the docket for the proposed rule, and they were not mentioned by EPA in the proposed rule, because EPA was silent about how it was going to implement this maintenance requirement. So, as a result of that failure of notice, we had significant adverse comments we could have made regarding agricultural soils in Imperial County, the emissions from those, regarding the lack of a prediction of what emissions would be from Mexicali, and the plan itself noted that there's a recent program in Mexicali to reduce emissions. So, there was no projection about what So, I'm confused about that argument, because I thought the point of this amendment of the Clean Air Act was that they could disregard the emissions from Mexico. So, why did they need to take that into account? Because they have to show that the attainment and maintenance is but for those emissions. So, establish that it's a but for causality needs to take into account the local, the actual U.S. emissions from this county are going down. Isn't that all they need to show, under even your theory? No, Your Honor. First of all, we're disputing that they correctly accounted for the emissions from the county, the agriculture. Okay, well, that's a different point, but let's just assume for a moment that they showed that the county's own emissions are just continuously going down. Wouldn't that be enough to meet their obligations, even under your view? Your Honor, they'd have to show that out to 2030. Okay, but so let's say they did. Why do they need to look at the emissions from Mexico at all? If they could show that out to 2030, isn't that enough? Potentially, Your Honor. I see your point. So, I don't understand. I mean, okay. So, it seems like the argument that they didn't consider future emissions from Mexico is just irrelevant. I don't understand why they had to, given that if they could show that their own emissions are going down, that's all that they need. There is the potential for things like climate change to exacerbate ozone issues. So, as the climate gets hotter, meteorology changes, it may not be enough that the emissions are declining. But that really doesn't have to do with Mexicali either. I mean, it might ultimately at some level, but not directly. Yes, Your Honor. All right. So, this notice failure was exacerbated with respect to the information relied on. It was exacerbated by the notice failure with respect to what the implementation would be, that they would look 10 years ahead. So, sorry, you mentioned, I think, agricultural soils and then the Mexicali situation. So, we've already discussed the Mexicali. But could you describe more? I mean, I think the only thing I really understood from your brief was this agricultural soils point. But could you just describe more why that shows that there was a problem with the data? Right. So, what it shows is this peer-reviewed paper cited that shows that the state is underestimating the emissions of nitrogen oxides from agricultural soils, which are, you know, Imperial County is predominantly agricultural. And the result of that, and the paper also sets forth some best management practices that could be used to mitigate that because it results from the use of fertilizer. So, the relevance of that is if the emissions were higher from the Imperial County, it could be that Imperial County by itself is causing the violations of standards. So, what you're saying is that because it is an agricultural area, it's one of the best in the world. You're saying that if it's used more, that there's going to be additional challenges that have to be taken into consideration? Well, that's one point we're making is that things change. You know, we've had this pandemic, things have changed a lot and sometimes in emissions from Mexico will go down, emissions from Imperial County will go up. And the EPA... You mean it's a possibility, like the world may end is a possibility? No, no, your honor. So, the point we make about agricultural soils is, you know, it's a significant error. I forget the exact number, but it's up to 30 percent or so in difference in emissions of nitrogen oxides. That does happen in growing areas and this is a growing area, but is there some indication they're going to go up because there's going to be more growing area? I don't understand how they get up. Is it because your ideas, because this is the bread basket of the world, that they're going to use more of this land for agriculture? Is that the point? Well, that's the potential. Now, the thing about predicting what's going to happen here is we have an incomplete record here because of the notice failure. Now, EPA discounts the possibility of what your honor saying might have been happening, but EPA hasn't reviewed the comments we would have made in order to assess whether, you know, that scenario is more likely. And so, their technical judgment on this is actually incomplete due to the notice. But wouldn't that have been true? I mean, if your point is that you're not looking at the agricultural emissions, wouldn't that have been true of the data that they did have in the notice, in the proposed rule? For the demonstration of attainment by the 2018 attainment date, your honor. So, did you make these comments about agriculture as to those? No, we didn't, but we're not required to make a comment on separate data. Remember, this maintenance thing is an independent requirement here. So, we're not required to make a comment on a separate requirement, attainment, in order to preserve an argument for this separate set of data out to 2030 for the maintenance requirement. But I mean, as I understand it, the data they did have, even at the notice, at the proposed rule stage, showed emissions going down from Imperial County. Isn't that right? Yes, it is, your honor, through 2018. But again, that's the data we dispute, you know, as applied to the maintenance requirements. Now. But, I mean, are you saying that if you took into account the agriculture, instead of going down, it would be going up? We're saying that EPA has not taken that into consideration here, because we're saying the levels are already higher than what EPA predicted because of the agricultural soils being underestimated. But is it enough that they wouldn't even have met the attainment in the first place, is what I'm trying to understand. I mean, I don't really understand it. If it's 30 percent higher, I'm not sure why you didn't make the argument that you don't even meet the attainment goal in the first place. Or is that wrong? Because, again, that is an independent requirement, attainment. So if we're going to, you know, have to make a comment on some independent requirement of the Act in order to preserve it for this other maintenance requirement, that seems like a very difficult burden for commenters. Remember, here, there was no indication in the notice that this requirement was going to be put in place in the final action. We didn't even know what type of information EPA was relying on, could rely on. It could rely on plan provisions that it thinks are sufficient to maintain standards and not rely on a technical demonstration. Now, so in the end, the notice issue, one of the important functions of notice is fairness to the public. And, you know, it's not a game of hide and seek here. EPA said nothing about maintenance requirement. That's not fair to the public in Imperial County, public that lives there and public that visits there in regard to the air they breathe. Now, one more point on this notice issue. I think the proof is in the pudding here because the district is very interested in the statutory interpretation issue. And they did not comment on this action. So they, so where was the notice to them that EPA was going to come up with these dueling interpretations? If, pardon me, Your Honor, if EPA had proposed both dueling interpretations, I think you'd be certain that the district would have come in and said, no, first interpretation is the right one in order to preserve their opportunity for judicial review. Now, I have to mention to the, Your Honors, that my clock is not showing, but I'd like to move on to the context here. Just eight minutes in case it's helpful to you. Thank you, Your Honor. So the district gives this example of a wrestling coach who tells their wrestler to attain and maintain their weight class by the end of year meet. And so two things about that. First, it omits the language by, that's important to put in there. But the second thing is about the context. So the context here is a pollutant that causes asthma and ER visits and premature death. So as the amicus committee civico details the impacts of community here. And so a better example, I think, would be if a doctor said, I want you to have a plan to attain and maintain a cholesterol level of 100 by the end of the year. If I came back to that doctor and said, here's my plan. I'm going to attain the level by December 1st. I'm going to maintain it until December 31st. But once the new year comes in, I'm going to go off my statins. I'm going to eat whatever I like. And the doctor would say, that's not what I meant. So the context here matters when interpreting these provisions. Now, the also here is the issue with the structural hole. The structural hole that we identified in our comments, EPA in its final action did not dispute. All they said there was, if there's a problem with domestic emissions increasing, we can apply our authority under Section 110K5. And as we detail in the briefs, they never actually explain how that could apply here. It only applies in three instances. And one is where the plan is inadequate to attain and maintain the standards. And the problem with applying that prong is that it would undercut actually 179B if EPA applied it. So and the second has to do with interstate transport of pollutants. So the third is to comply with any other requirements of the Act. So for EPA to apply that provision to a plan, there must be a requirement that it applies to that EPA has created. In this case, EPA has to create it under Subsection A. It has to create some kind of maintenance requirement there in order to apply its authority to call for a plan revision. And that authority would be, that requirement would be the hook for EPA to apply its authority. And EPA did not do that there. Could it also be that the NAAQS was changed? Well, this is regards to the standard for the 2008 plan, ozone plan. So if EPA tightens the standard later, then there would be a separate set of requirements that would kick in. But those were referenced. And there has been, there is a later set of requirements, right? So can you explain what the status of that is and whether it affects what is going on in this county? Well, it may affect it down the road, but the potential for the district to have to do something in order to attain the later standards, 2015 standards, does not affect the issue here with respect to approval of a plan for the 2008 standards. Does it make it irrelevant at some point though? Are the 2015 standards stricter? They are stricter. So at some point that could kick in and the area might attain those standards, or we might see the district again doing a similar demonstration, a buck four demonstration. So during this period though, until that happens, the requirement is that they have to have a plan to maintain the 2008 standards, but for international missions. When will the 2015 standards become relevant enough though? It seems like we must be close to that. Well, it's an extended process and EPA is not always timely in carrying out the steps. So there's three years to designate the areas. Then they're designated what's called marginal, which essentially imposes no requirements. And then there's an attainment date for which areas can get up to two year extensions. And then after that, states may have obligations if they're reclassified to the higher level and so on. But again, states are given time to meet those obligations as well. So we're talking at least several years now. My time, I'm not sure. About three minutes. Okay, I'll reserve the rest for John. Could you just articulate in a sentence or two exactly what the relief is that the center as petitioners would seek? Yes, your honor. We seek vacature and remand of EPA's approval of a plan with respect to the maintenance requirements in section 179B. And we are not seeking vacature and remand of the P&R statement. Thank you. I think next on the argument side is Mr. Augustini on behalf of the US EPA. Yes, your honor. Thank you. Good morning. Michael Augustini for EPA and acting administrator. Jane Nishida. I'll do a brief introduction and then address the court's question about finality. As our briefing explained, EPA complied fully with the Administrative Procedure Act. The agency's record demonstrates that approving the 2008 ozone plan revisions for Imperial County under section 179BA was reasonable, not arbitrary and fabricious. But for international emissions from Mexico, Imperial County's planned submissions were sufficient to attain and maintain the 2008 ozone standard, the NAAQS. In fact, petitioners agree that Imperial County would have attained the NAAQS by the applicable date, but for international pollution from Mexico. EPA's conclusion that domestic ozone precursor emissions in Imperial County not only were below the NAAQS at the time of the attainment date, but also will continue to decline in the future, is not seriously contested in this court. And those uncontested facts in the record, as Judge Friedland suggested in earlier questions with petitioner's counsel, are more than sufficient in themselves to sustain EPA's approval here. Petitioners mainly raise speculative concerns about what might happen in the future. Some other hypothetical scenario that's not at issue here. And with regard to the data in this administrative record, they posit that there might be a spike in ozone levels at some point. Maybe another pollutant might present a more complicated analysis of the international impacts. Those things are plain here. Those conclusions are not contested. And so that's the speculation about what might happen or what might be a right decision on some other record should not be entertained by the court. There's a strong rationale based on this record with respect to 2008 ozone in Imperial County to find it reasonable, rational, not reasonable. Yes, Your Honor. As you noted, agricultural emissions are included in the inventories that are used in the analyses with respect to Section 179B. So there are emissions attributed to decision making and the decision here. So the alleged undercounting, if any, occurred is front and center based on the proposal that EPA issued saying, here's what we think the emissions are. This is how we're counting them in terms of the modeling, the different analyses that are being used. So attainment and maintenance is not a separate issue. Those were both being and in the states and the Imperial County submissions. So the time to raise that question was before the agency. The fact that their brief cited a 2018 study focusing on San Joaquin Valley just shows that if they had wanted to rely on that article, EPA's rulemaking proposal, the initial, was in November 2019. So even that study was available to them if they thought that there was a significant amount of undercounting agricultural emissions. And the law is clear if you don't raise those points in your objections, you waive them. So since there are like 10 more studies of agricultural areas that show it's not even 30% wrong, it's 200% wrong or something. And this issue in the future shows that there are actually much worse emissions in this county than were anticipated at the time of the rulemaking, or sorry, of the approval of the plan. Is there a mechanism for EPA to address that under your view of how this works? Yes, your honor. I think so. I mean, it's the emissions in the inventories in the first instance are developed by the local area, in this case, Imperial County, and the California Air Resources Board, BARB. So if in light of this study that petitioners cite in the reply or any additional studies that may be done in the future, if California decides that the emissions inventory for that might trigger a different sort of analysis on these questions. But what if California doesn't decide that? Can EPA force it? I mean, as I understand it, one of the center's arguments is under EPA's view of how this works. There's like never anything that will trigger an additional review. We did note in the brief, your honor, that EPA has the option of requesting reports. If there's any question about it, if EPA thought there was a problem with emissions inventory in California, that problem would pervade entire air regulation. And I don't think there's any question, even from the petitioners, that EPA could address that in this instance or in any other scenario. So there is the authority under Section 110K5 that's known as the SIP call provision. If EPA determines, whenever it determines a state implementation plan or SIP is substantially inadequate, EPA can ask the state to do a revision. And ultimately, the state doesn't do an appropriate one, issue a federal plan. So there are mechanisms to deal with future events or unexpected changes in the law. Just to give you an example from one of the cases we cited in the brief on the SIP call authority, U.S. magnesium, that involved a Utah state implementation plan. And the question involved a rule regarding unexpected breakdowns in pollution generation facilities. And EPA approved the SIP in 1980, some 20 plus years later, after rethinking the matter as a policy matter, decided that unexpected breakdowns should not be included in SIPs and asked the state to eliminate that from its approved plan. The state didn't agree, and ultimately it got litigated, and EPA's authority to call for that change was affirmed in the 10th Circuit. Sorry, Your Honor. I thought you were through. You go ahead. No, please, sir. One of our former chief judges used to warn us to don't go up the hill without a payload, as Judge Chambers from Arizona, now deceased, but he was a logical person. I'm just wondering whether or not this, there is an issue before us of whether any of these are final agency actions where we have jurisdiction. Would you identify what the position of EPA is as to whether any of these are final actions, and which you believe were, and help me with that. I would like to know about that before I spend a lot of my mental time on the remaining part of the case. Yes, Judge Wallace, we appreciate the pre-argument question and the opportunity to address it, but EPA's position is that the agency applied alternative legal interpretations to support its conclusion that the plan satisfied section 179 B, A, and B. You're taking the position, if I understand you, that all of these are final actions? The approval itself, in other words, the green light, red light, yes or no call, is, in our view, a final agency action. EPA did not choose between the two possible interpretations, so that isn't really a question that the court needs to involve. We think there is jurisdiction to review the approval, and the way we conceive of the question is not so much in terms of jurisdiction, but as a matter of prudential or wise judicial economy or judicial decision making. We don't work on setting aside our jurisdiction because it might be convenient for the parties to get an answer. We don't have the power to raise our voice until we have jurisdiction, and I wondered why something like an argument of maintain and maintenance is a final agency action. Is EPA dismissing at all arguments about each of these issues that are all final agency actions? No, Your Honor, and we did not mean to suggest that the court can overlook jurisdictional issues. That's certainly not what I meant to suggest. Oh, no, you can take your position as to whether or not we have jurisdiction, but it is important we have to cover it, and I just wanted, as I understand, there has to be a final agency action before we are going to worry about it, and I wanted to get the position of EPA on all of these issues of whether or not they are final agency actions. Yes, Your Honor, I don't believe that there's any question that the EPA's approval of these plans is final agency action. Therefore, the court has jurisdiction to consider the basis for that, including the legal rationale, which was alternative interpretations of an ambiguous statute. We don't have any issue. The notice questions are different, in my mind, than the substantive outcome, which was approving the plan, but as a matter of judicial jurisprudence, what we suggested in our brief is that the court doesn't need to spend a lot of time and energy on figuring out whether one or the other interpretation is acceptable because, as Petitioner's Counsel discussed in response to some of Judge Friedland's questions earlier, they agree that the second alternative interpretation, which provides some form of ongoing maintenance past the attainment date, is acceptable, and that leads to the question being whether EPA's application of that, as discussed in the final rule, the preamble of the final action, is arbitrary and capricious. And for the reasons I've noted, there's absolutely no evidence whatsoever, not a shred of evidence, to suggest that domestic are going to increase through 2030. So the standard will be maintained, regardless of what happens in Mexico. That's EPA's position. And the court can review the rationale of EPA's rule, EPA's action, the final action to approve the plans here. That's EPA's position, Your Honor. Thank you. Did we think of this approval more like an adjudication? It's kind of an odd thing. It feels more like an adjudication to me than it does like a rulemaking. Your Honor, I have the same sense. It does have aspects of an adjudication, for sure, because it's an approval or a no-go or a go. But it is considered a rulemaking, and so that's how these are analyzed under the Clean Air Act. But it really, I think that's what distinguishes it from the fact that there is a concrete decision, is what distinguishes safer chemicals, where what the court had before it was an implementation rule. EPA saying, this is how we intend to apply this particular cost of provision in the future. We're going to decide this on a case-by-case basis. We're not excluding anything necessarily right now. And the court, we feel correctly, said that in that scenario, it's hypothetical or a speculative injury. There's no finality. But here, there is a final action that's reviewable, and that is the approval. We just don't think it's necessary. EPA didn't choose between one or the other, and we don't think it's, given the way petitioners have presented their entire arguments focusing on the first, other than the arbitrary and capricious State Farm standard with respect to the application of the rule, which is a simple question, in our view, based on the record evidence showing declining emissions, that there's a need to weigh in on all of the statutory construction questions, which are more complicated to consider. There's an easier path to deny the petition for review, and that's the second we agree that whatever happens in Mexico in the future is not germane. You know, what we're talking about is maintenance of domestic sources. So, if those never increase, which is basically what all the data showed, both up to the attainment date and well beyond, as EPA explained, you don't have a problem. Mexico might have more impact in the future or less, but EPA's focus was on domestic sources for good reason. Certainly rational to view it that way. So, Your Honor, that's the core rationale for EPA's action, you know, stands on its own. There's no question that Mexico has a substantial impact on Imperial County in terms of ozone levels. Just to put a finer point on that, the data, I believe it's Table 8 in the initial proposal, analyzed the ozone levels. The monitoring sites closest to the border, Calexico, which is within a mile of the border, and then El Centro, which is about eight or nine miles further north, had the worst air quality in terms of ozone. And those were one or two parts per billion above the 75 parts per billion 2008 standard. If you take Mexico out, as EPA explained and the state showed, the air quality at those monitors would have been in the range of 64 to 65. So, well below the NAAQS based on domestic sources. And there isn't, petitioners can see they're not challenging that finding. And they haven't raised any significant question about what will happen in the future either. So, on that, there simply isn't a basis to conclude that EPA's action, the approval, was anything other than rational and consistent with the Clean Air Act. So, we respectfully request that this should be denied. Let me ask you one final question. It's not clear to me in reading the briefs, and that is whether or not the EPA took into account the possible increase of farming in the we know what a great area farming area there is down there. And where you have the best farming area in the world, there are other farmers who will come and use it. In what way, if any, did EPA think about the increased number of farms that will occur over the next generation? Yes, Your Honor. I would say that the, as I mentioned earlier, the agricultural sources are built into the emissions inventories that the state puts together, both the current and the projected future inventories. So, you know, agriculture is already, you know, very, you know, common in that area. There's no, there were no comments or basis to believe that all of a sudden agriculture in Imperial County is going to increase exponentially. You know, that's just not, there wasn't any suggestion or anything on the record for EPA to even analyze that question. So if they had wanted to make that point, it would have been abundantly clear from what EPA actually said it was doing and how it analyzed the statute, that they should have raised it then. It's a complicated question, how agriculture might factor in given the whole mix of sources that are included in inventories. And on this record, Your Honor, we submit that it's just pure speculation to say that there'd be some change that would impact Imperial County's ability to remain below the standard. I suppose the answer is there was no objection and it wasn't raised. That's for sure. Yes. And I suspect it's only because I've driven by that area many times that I'm raising it. But if it hasn't been raised, then it's not before us. And thank you for your answer. Thank you, Your Honor. Yes. So I have a question for you, if I could interject. And that is, if your wish were granted by the panel, then could you tell me, would EPA be asking that the panel simply deny the petition? Yes, absolutely, Your Honor. That's correct. And would you have, you would have us say nothing about whether a standard could just be attained without maintenance and be satisfactory? Yes, I think that could be a basis for deciding the question presented here, that given that petitioners have acknowledged many times in both their initial brief and the reply that the second alternative interpretation EPA discussed is acceptable under the Act, that it's not necessary for the court to pick between the two. And we certainly would prefer that if that's what it comes down to, that the agency makes that determination in the first instance. If there has to be one interpretation and only one, which we don't think anybody has argued, that should be a call for the agency. But certainly based on the presentation here, denial of the petition we believe is appropriate. Okay. Thank you for your answer, counsel. Thank you. Then we need to hear from the counsel for the intervener from Imperial County. Not intervener, the amicus part, Imperial County, and that's Mr. Rothman. I think you're muted. I was just saying I wanted to thank Mr. Agostini. Then I said that we need to hear from counsel for the amicus party, Imperial County, and that's Mr. Rothman, I believe. Mr. Rothman, I think your mic is on mute. We're not hearing you. Can you hear me now? Yes, I can hear you now. Sorry about that, because I had to patch in through the phone because of a mic problem with the computer. So good morning. May it please the court. My name is Rick Rothman with the law firm of Morgan Lewis, appearing on behalf of the Imperial County Air Pollution Control District. As you know, the district is the California Air Pollution Regulatory Agency, that took the laboring oar in putting together the State Implementation Plan, or SIP, revision that is at the center of this case. As one of the small number of state agencies that is responsible for addressing impacts of cross-border emissions, the district has been involved in its fair share of these demonstrations under Section 179B of the Clean Air Act since Congress created that provision in 1990. As you may know, the district invests very significant time and effort into the SIP submittal. The district provides draft submittals for public comment. It holds workshops for interested parties in an effort to address stakeholder concerns and issues before a SIP submittal is finalized. The district would note that petitioners here did not raise this issue regarding definitions of maintenance or maintain during the public comment period on the draft submittal, nor were we aware of petitioners making this argument with respect to any of the prior SIP submittals the district had done under 179B. In fact, the district is not aware of anyone suggesting that the district's 179B demonstrations were somehow inadequate because they failed to show maintenance of an act past the attainment date but for these international emissions. Given the argument we just heard, I'll keep this focused on two important topics where I believe the district's perspective and our experience can hopefully provide some helpful information for the court. First, as an agency tasked with preparing a demonstration under 179B, the district's perspective is that the fair and most straightforward interpretation of that provision of the Clean Air Act simply requires a demonstration of attainment and maintenance of an act but for international emissions only as of the attainment date. Second, the district and the state submitted a plan with a demonstration that has measures in the SIP that are intended to attain and maintain the 2008 ozone standard by the attainment date of July 2018, but these measures don't expire. They certainly don't expire as of the attainment date and thus the demonstration of attainment and maintenance but for international emissions extends well beyond the attainment date. With respect to the proper interpretation of 179B, we appreciate that EPA has offered two alternatives, but our belief is that the text, the statutory scheme, and the purpose of 179B all support approval of the SIP and demonstrate the plaintiff's novel argument that the word maintain somehow creates an obligation extending past the attainment date and misses the mark. Starting with the text, the phrase by the attainment date modifies both attain and maintain. You look at 42 U.S.C. 75. Why is this issue reviewable? Well, so when you say why is it reviewable, I think it's reviewable because it's part and parcel of the alternative bases upon which EPA approved the SIP. But it approved it on alternative bases, so we wouldn't really have to reach this argument, would we? I don't think you have to reach either of the arguments. We just think that this is the right interpretation. If you don't want to reach that argument, I think under the safer chemicals and healthy families case, you don't have to reach that. I think that's correct. Is agriculture increasing in the county? Well, are you asking if agriculture, the agriculture industry is increasing or if emissions from agricultural industry are increasing? I guess both because they say you're not capturing the I don't know that the district tracks whether the overall acreage under agricultural use is increasing, decreasing, or staying steady. In fact, I'm not aware of them doing that. What they do do, however, is regularly monitor emissions in the county, and they create these inventories based on that monitoring and based on modeling and based on calculations that take account all of the sources. They also have rules in place that control emissions from agricultural sources in the county. The answer is that the planning that is done for SIP purposes takes into account both the monitoring and the modeling that is intended to capture the predictions as it relates to all sources of emissions inside the county, including those that are agricultural. And that includes emissions related to it. Yes, in my view, it relates to all emissions from all sources in the county, and that what they do is track how their efforts to control emissions in the county are reflected in the monitoring that they're doing on a regular basis. I'm happy to sort of skip forward if you don't want to hear about the interpretation 179b, but I will say that using the plaintiff's doctor analogy, they've got it wrong. It's as if the doctor's plan included an implantable statin that couldn't be removed as of the date that they decided that the plan was going to go into place. Much like that doctor, Imperial County can't simply undo all of the rules that are included in the SIP on the attainment date. Those rules stay in place. The impact of those rules stay in place. And the reality is that if they were to try to undo any of it, they would be subject to anti-backsliding requirements under the Clean Air Act and EPA review. And the other reality is that as we've already heard, EPA revises its air quality standards with some, you know, periodically. And in this case, there's already been a revision of the 2008 Ozone Act. So we will be working to comply with a new, more stringent standard. So there's really no reasonable situation going forward that we would be using any sort of modeling, any sort of data to somehow reduce or relax the requirements that are in place as part of the 2008 Ozone Act. So is this already moot? I don't think so because we still have to And so I don't believe that this is moot. I see that I'm kind of running over my time, but I did want to say that, you know, at the end of the day, you know, we've already heard EPA talk about the sources that they relied on. But in the end, EPA's conclusion is supported by the measures undertaken by the district. The district imposes a number of rules, including DACT, RACT, and offset rules that are intended to make sure that the domestic sources of ozone precursors are continuing to decline. And I also just want to very quickly mention that the district does take steps outside of its SIP to pursue continued emissions reduction and is working with other U.S. and Mexican agencies to try to reduce emissions at the border. So if there are no more questions, we do respectfully request that the court deny the petition, which will maintain EPA's approval of the SIP for Imperial County, and properly account for the fact that, but for emissions from Mexico, the county would have attained the eight-hour ozone max. Okay. Do we have any questions from my colleagues? Not here. Thank you. And not here either. So I think, therefore, Mr. Rothman, we thank you for your argument. And we'll return to Mr. Odendo. For rebuttal. You're on mute. We can't hear you. Thank you, Your Honor. So EPA's counsel noted that there was no problem with tracking Mexican emissions if domestic emissions stay the same. That's exactly the problem. If domestic emissions increase, then the emissions from Mexico are relevant to whether or not the area is still maintaining the standards, but for international emissions. And EPA has imposed no tracking device regarding those emissions. This is the same thing again. I don't understand this. So if it's but for Mexico, you don't need to figure out Mexico. You just need to figure out what's coming from the county. No. If the emissions, Your Honor, if the emissions increase from the county, and the emissions decrease from Mexico, then Mexico may no longer be the but-for cause of violations. You could figure that out just by looking at from the county, right? If the county is above the level on its own, then Mexico isn't the but-for cause. The air quality monitors do not determine where the emissions are coming from. So just looking at the domestic emissions rising by itself is not enough to determine whether those emissions are the but-for cause. So in this respect, the EPA downplays the possibility of this happening, but the act is a belt-and-suspenders approach. It doesn't rely just on technical demonstrations. So for example, we gave maintenance plans under Section 175A. Congress required both a technical demonstration but also contingency provisions, a backstop, if the projections go wrong. And this is where EPA falls down. There's no backstop here, and it cannot use its plan call authority because it did not create any requirements for ongoing maintenance. And that's exactly the problem here. So in conclusion, I'll say that the EPA's approach to this seems to be trust us. We don't, you know, it won't happen, but the act is a comprehensive program for regulation of air and the people who live in Imperial County and the people who visit Imperial County also require the full protections of the Clean Air Act, which is not just a technical demonstration, but this backstop, whether it be through plan call authority, which is only discretionary and needs that information about emissions from Mexico in order to be invoked in order to address problems with increases in domestic emissions. So if the panel has no further questions, for those reasons, we would ask support to vacate and remand EPA's approval in the ozone plan. Thank you, Counsel. Well, unless there are questions from Judge Wallace or Judge Friedland, I think that concludes our argument. I just want to comment that I know that the full panel appreciates the excellent complicated problems and the impact of the lives of so many people that we're glad to have all the help we can get. This case shall now be submitted and the parties will hear from us in due course. This court for this session stands adjourned.
judges: Wallace, Gould, Friedland